UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

ENTERGY ARKANSAS, INC.,

                    Plaintiff,

         -against-

ROBERT S. KENNEY, in his official capacity
as Commissioner and Chairman of THE
MISSOURI PUBLIC SERVICE
COMMISSION; and STEPHEN M. STOLL,
WILLIAM P. KENNEY, and DANIEL Y.
HALL, in their official capacities as
Commissioners of the MISSOURI PUBLIC
SERVICE COMMISSION;

                    Defendants.

Docket No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Nature of Action

1.      Plaintiff Entergy Arkansas, Inc. brings this action against the Commissioners of the

Missouri Public Service Commission ("MoPSC") seeking declaratory judgment and injunctive relief.

Entergy Arkansas seeks a declaratory judgment that MoPSC's Order of October 9, 2013 ("MoPSC

Order") is preempted by the Federal Power Act ("FPA"), and is independently invalid under the

dormant Commerce Clause, and thus cannot be enforced to impose conditions on the integration of

Entergy Arkansas' Missouri-based electricity transmission assets into the Midcontinent Independent

System Operator, Inc. ("MISO"), a regional transmission organization ("RTO").[1] Entergy Arkansas

---

[1]   MISO was formerly known as Midwest Independent Transmission System Operator, Inc.

further seeks a permanent injunction prohibiting Missouri officials from taking any action to enforce the MoPSC Order.

2.      Since the 1935 enactment of Part II of the FPA, the federal government has exercised exclusive regulatory authority over "the transmission of electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate commerce."  16 U.S.C. § 824(b).  In granting this broad jurisdiction to the Federal Power Commission (now the Federal Energy Regulatory Commission ("FERC")), Congress drew a "bright line easily ascertained[] between state and federal jurisdiction . . . by making [the Commission's] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States."  *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 215-16 (1964).

3.      During the twentieth century, technological development vastly expanded the potential for an interstate wholesale electricity market, a market within FERC's exclusive jurisdiction under the FPA.  Specifically, advances in the ability to transmit energy over longer distances "enabled utilities to operate more efficiently by transferring substantial amounts of electricity not only from plant to plant in one area, but also from region to region, as market conditions fluctuate."  *New York v. FERC*, 535 U.S. 1, 8 (2002).  For example, it became "possible for a customer in Vermont [to] purchase electricity from an environmentally friendly power producer in California or a cogeneration facility in Oklahoma."  *Id.* (internal quotation marks omitted).

4.      The promise of these technological advances was not immediately fulfilled, however. Public utilities retained "ownership of the transmission lines that must be used by their competitors," which gave them "the power either to refuse to deliver energy produced by competitors or to deliver competitors' power on terms and conditions less favorable than those they apply to their own transmissions."  *Id.* at 8-9.

5.    FERC began to fix this problem in 1996 when, "[i]n its pathmarking Order No. 888, FERC required utilities that owned transmission facilities to guarantee all market participants non-discriminatory access to those facilities.   That is, FERC required all transmission-owning utilities to provide transmission service for electricity generated by others on the same basis that they provided transmission service for the electricity they themselves generated." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363-64 (D.C. Cir. 2004) (Roberts, J.) (citations omitted).   To foster such competition, "FERC required public utilities to 'functionally unbundle' their wholesale generation and transmission services by stating separate rates for each service in a single tariff and offering transmission service under that tariff on an open-access, non-discriminatory basis." *Id.* at 1364.

6.    FERC's initial approach did not fully succeed.  "In FERC's view, inefficiencies in the transmission grid and lingering opportunities for transmission owners to discriminate in their own favor remained obstacles to robust competition in the wholesale electricity market.  FERC concluded that these problems could be remedied through the establishment of RTOs, explaining that better regional coordination in areas such as maintenance of transmission and generation systems and transmission planning and operation was necessary to address regional reliability concerns and to foster regional competition." *Id.* at 1364 (internal quotation marks omitted).  "FERC concluded that RTOs would:  '(1) improve efficiencies in transmission grid management; (2) imp[rove] grid reliability; (3) remove remaining opportunities for discriminatory transmission practices; (4) improve market performance; and (5) facilitate lighter handed regulation.'" *Id.* (quoting *Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, 1999 WL 33505505, at *2 (1999) ("Order No. 2000")).  While FERC recognized the possibility that some customers may face higher costs due to a company's integration of its transmission assets into an RTO, *see* Order

No. 2000, FERC Stats. & Regs. ¶ 31,089, 1999 WL 33505505, at *12, that concern did not prevent FERC from adopting the "objective . . . for all transmission-owning entities in the Nation . . . to place their transmission facilities under the control of appropriate RTOs in a timely manner," *id.* at *2. FERC directed transmission-owning utilities either to participate in an RTO or to explain their refusal to do so. *Id.* at *4.

7.    The instant complaint arises from the effort of Plaintiff Entergy Arkansas, Inc. ("Entergy Arkansas") and its affiliates in Louisiana, Mississippi, and Texas (collectively with Entergy Arkansas, the "Entergy Operating Companies") to fulfill Order No. 2000's objective by placing their transmission facilities under the control of an acceptable RTO. After years of discussions with FERC, retail regulators, and other stakeholders, the Entergy Operating Companies determined that integration into MISO would result in a projected $1.4 billion in benefits (net present value) to their retail customers over a ten-year period.

8.    To achieve MISO integration, the Entergy Operating Companies and MISO were required to file with FERC multiple agreements and tariffs subject to its exclusive jurisdiction. In one of those cases, FERC conditionally approved the transmission rates that would govern transmission service over the combined MISO-Entergy system. *ITC Holdings Corp.*, 143 FERC ¶ 61,257 (2013) ("*Entergy-MISO Transmission Rate Order*"). Affected parties had the opportunity to intervene and to argue that such proposed rates were not just and reasonable. Certain Missouri-based utilities and the Southwest Power Pool ("SPP"), an RTO that was competing with MISO for the Entergy Operating Companies' integration, raised two such objections.

9.    *First*, several intervenors, including Kansas City Power & Light Greater Missouri Operations Company ("GMO") and The Empire District Electric Company ("Empire"), one of the SPP Transmission Owners, argued that the integration would lead to some Missouri wholesale

customers facing higher rates by virtue of the MISO tariff than they pay under Entergy's current tariff. *See, e.g.*, SPP Transmission Owners' Protest, Motion for Consolidation and Request for Evidentiary Hearing, Docket No. EC12-145-000 *et al.* (FERC Jan. 11, 2013) ("SPP Transmission Owner Protest"). GMO, for example, argued that Entergy Operating Companies and MISO should hold GMO harmless for increased transmission costs resulting from the application of MISO's tariff to them once the Entergy Operating Companies integrate into MISO. *See* Comments of KCP&L Greater Missouri Operations Company at 3, FERC Docket No. EC12-145-000 *et al.* (Jan. 22, 2013). FERC did not accept the argument. The intervenors have sought rehearing of that decision, and their petitions for rehearing remain pending at FERC.

10.     *Second*, several intervenors, including Empire and SPP, complained of so-called electrical "loop flows" that would occur over the new boundary (often called a "seam") between MISO and SPP due to the increased coordination between the Entergy Operating Companies and MISO. *See, e.g.*, SPP Transmission Owner Protest at 20-22. Loop flows "are an unavoidable consequence of interconnected operations; as a matter of physics, power can, and sometimes will, flow over the transmission line of an interconnected, neighboring transmission system." *Am. Elec. Power Serv. Corp.*, 93 FERC ¶ 61,151, at 61,474 (2000). Recognizing this reality, FERC has long "directed the utilities themselves, in the first instance, to work to resolve such [loop flow] issues." *Id.* Consistent with that policy, FERC declined to accept the intervenors' argument because it found "that existing arrangements are in place that address power flows between MISO and certain neighboring regions," including the FERC-approved Joint Operating Agreement ("JOA") between MISO and SPP that governs their combined electrical border. *Entergy-MISO Transmission Rate Order*, 143 FERC ¶ 61,257, at P 128. FERC also recognized that these arrangements could be improved and noted that MISO and SPP were in fact discussing potential changes to their JOA "to

address congestion across the seam between the two RTOs." 143 FERC ¶ 61,257, at P 150.  FERC directed MISO to file an information report with FERC by November 1, 2013, detailing the status of the negotiations.  MISO complied by filing the report on October 31, 2013.

11.     In addition to seeking various FERC approvals,  the Entergy Operating Companies also sought approval from the five regulatory bodies in states (unlike Missouri) where the Entergy Operating Companies have retail customers:  Arkansas, Louisiana (portions of which are regulated by the Louisiana Public Service Commission, and portions of which are regulated by the City of New Orleans), Mississippi, and Texas.[2]   Each retail regulator approved the integration of the Entergy Operating Companies' assets into MISO without imposing any condition related to the two objections just discussed.  Indeed, when one such objection regarding the JOA was made to the Arkansas Public Service Commission, that Commission correctly determined that "concerns associated with the [MISO-SPP JOA], its renegotiation and any resulting compensation associated with loop flows pursuant to the JOA are FERC matters on which this Commission will not comment."  Order No. 54, Docket No. 10-011-U, at 103-04 (Ark. Pub. Serv. Comm'n Oct. 28, 2011).

12.     Entergy Arkansas did not initially seek approval from the MoPSC to join MISO because it was transferring only functional control (not physical or legal ownership) of its assets to MISO and because it serves no retail customers in the State.  Entergy Arkansas' Missouri-based transmission assets are not used by Entergy Arkansas to provide power to retail customers in Missouri; they are used instead to provide interstate delivery of power into Missouri at wholesale to Missouri-based utilities who in turn sell the power at retail to *their* Missouri-based retail customers.

---

[2]   There is also a very small number (less than two dozen) of retail customers in Tennessee.

6

Accordingly, Entergy Arkansas believed that the integration of the Missouri transmission assets was solely within FERC's jurisdiction and outside MoPSC's jurisdiction.

13.     MoPSC took a different view, adopting arguments similar to those that the Missouri-based utilities had unsuccessfully pressed at FERC, and taking a different approach from those taken by any of the regulators in the other jurisdictions.  On October 9, 2013, the MoPSC issued an order (Ex. A hereto) that purports to regulate Entergy Arkansas' integration of its Missouri assets into MISO.  Specifically, the MoPSC Order grants approval of the integration subject to certain conditions:  (1) "the negotiation and approval of a revised Joint Operating Agreement between [SPP] and [MISO]"; and (2) "a requirement that Entergy Arkansas, Inc., and/or ITC Midsouth, LLC, hold harmless non-MISO Missouri retail customers from all increased costs due to Entergy's potential transfer of functional control of its transmission assets to MISO."  Ex. A at 13.

14.     Under the FPA, the MoPSC Order is preempted and thus invalid.  The Order intrudes upon FERC's exclusive authority over the field of interstate transmission of power and the exchange of electricity at wholesale; conflicts with FERC's decision not to accept the proposed conditions; and effectively imposes a wholesale transmission rate that diverges from the rate approved by FERC for the new MISO configuration.

15.     The MoPSC Order is independently invalid under the dormant Commerce Clause of the U.S. Constitution.  Specifically, the Order imposes a direct burden on, and indeed is an attempt to directly regulate, agreements providing the rates, terms, and conditions of transmission in interstate commerce that affects more than a dozen states.  The Order also facially discriminates against interstate commerce because it holds only the non-Missouri entity Entergy Arkansas, and not Missouri entities such as Ameren Missouri, liable for higher rates that will be faced by non-MISO

Missouri customers.  Further, the Order imposes burdens on interstate commerce that are far greater than the small, parochial gains to Missouri customers.

16.     Entergy-affiliated entities have spent $107 million through September 2013 to implement MISO integration, and costs are ultimately projected to reach $122 million.  After years of planning and coordination, the integration is scheduled to take place by December 19, 2013. Moreover, if the Operating Companies are unable to join MISO together by December 31, 2013, it is not clear when, if ever, all the Operating Companies will be able to do so because several of them will have to submit to their respective retail regulators a new or revised application to join MISO, and MISO will have to undertake new planning for an orderly integration of the assets into the MISO grid.  This integration date applies not only to the Entergy Operating Companies and their approximately 2.8 million retail customers across a four-state region, but also to approximately one dozen unaffiliated load-serving utilities located within that region that purchase from the wholesale market and approximately three dozen unaffiliated merchant generators that sell into the wholesale market.

17.     By this action, Entergy Arkansas seeks a declaratory judgment that the MoPSC Order is preempted by the FPA and thus cannot be enforced to impose conditions on the integration of Entergy Arkansas' Missouri transmission assets into MISO.

18.     By this action, Entergy Arkansas also seeks a declaratory judgment that the MoPSC Order is invalid under the dormant Commerce Clause and thus cannot be enforced to impose conditions on the integration of Entergy Arkansas' Missouri transmission assets into MISO.

19.     By this action, Entergy Arkansas also seeks a permanent injunction prohibiting Missouri officials from taking any action against Entergy Arkansas, the other Entergy Operating Companies, and/or MISO, to enforce the MoPSC Order.

## The Parties

20.     Plaintiff Entergy Arkansas is a corporation that is incorporated in Arkansas and maintains its principal place of business in Arkansas.  Entergy Arkansas is a vertically integrated utility serving approximately 696,000 retail customers in 63 counties in Arkansas.  Entergy Arkansas owns 4,753 miles of transmission lines in Arkansas.  By contrast, it owns only 87 miles of transmission lines in Missouri along with four substations and serves no retail customers in Missouri.

21.     Defendant Robert S. Kenney, an individual, is Commissioner and Chairman of the Missouri Public Service Commission and resides in the City of St. Louis, Missouri.  Defendants Stephen M. Stoll, William P. Kenney, and Daniel Y. Hall, also individuals, are Commissioners of the Missouri Public Service Commission.  Defendant Stoll resides in Jefferson County, Missouri; Defendant William P. Kenney resides in Lee's Summit, Missouri; and Defendant Hall resides in Columbia, Missouri.

## Jurisdiction and Venue

22.     This Court has subject-matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331 (federal question) because the first claim seeks, through the Supremacy Clause and doctrines of preemption embodied therein, to interpret and to apply the Federal Power Act, 16 U.S.C. § 791a *et seq.*; and the second claim seeks, through 42 U.S.C. § 1983, to interpret and to apply the dormant Commerce Clause.

23.     Additionally, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity).  Plaintiff Entergy Arkansas is a citizen of Arkansas because it is incorporated in Arkansas and maintains its principal place of business there.  Defendants are individuals who are

citizens of Missouri because they reside there.   The value of the immediate object of this litigation, 87 miles of transmission lines and associated transmission assets, exceeds $75,000.

24.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of Missouri and two of the Defendants, Defendants Robert S. Kenney and Stephen M. Stoll, reside in this District.  Venue is also properly vested in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendants' Commission maintains an office in this District.  Venue is also properly vested in this Court pursuant to 28 U.S.C. § 1391(b)(2) because over 80% of the transmission assets at issue are located in this District.

25.     The relief requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 (declaratory judgment), 28 U.S.C. § 1651(a) (injunctive relief), and 42 U.S.C. § 1983 (declaratory and injunctive relief available for Commerce Clause violations, *see Dennis v. Higgins*, 498 U.S. 439, 440 (1991)).

## Substantive Allegations

## I.     DEVELOPMENT OF THE INTERSTATE WHOLESALE ELECTRIC ENERGY MARKET AND FERC'S EXCLUSIVE AUTHORITY OVER TRANSMISSION OF ELECTRIC ENERGY IN INTERSTATE COMMERCE

26.     Prior to the enactment of Part II of the FPA in 1935, "most electricity was sold by vertically integrated utilities that had constructed their own power plants, transmission lines, and local delivery systems.  Although there were some interconnections among utilities, most operated as separate, local monopolies subject to state or local regulation. . . .   Competition among utilities was not prevalent."  *New York v. FERC*, 535 U.S. at 5.

27.     Without significant regional coordination, the only way a utility could ensure its ability to meet peak electric demands, however infrequent such peaks might be, was to build a power

plant that might "ru[n] only 10, 15, 20, 50 hours a year." *PPL EnergyPlus, LLV v Hanna*, 2013 WL 5603896, at *9 (D. N.J. Oct. 11, 2013) (internal quotation marks omitted).

28.     Some utilities in the early twentieth century responded by selling power or standby capacity to utilities in neighboring states. This raised the question whether state or local authorities had authority to regulate such transactions. In 1927, the Supreme Court held that Rhode Island's effort to regulate a sale of electricity from a Rhode Island utility to a Massachusetts utility imposed a direct burden on interstate commerce and thus violated the dormant Commerce Clause of the U.S. Constitution. The interstate transaction, the Court reasoned, was for the federal government to regulate, not the states. *See Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 90 (1927) ("*Attleboro*"). This resulted in a regulatory vacuum as Congress had not at that time granted any agency federal statutory authority over wholesale sales of electricity. *New York v. FERC*, 535 U.S. at 6.

29.     Congress filled this so-called *Attleboro* gap in 1935 by enacting Part II of the FPA, which vested FERC's predecessor with the broad jurisdiction to regulate "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b). The FPA thus drew a bright line between the exclusive regulatory spheres of state and federal authority. States lack authority to regulate the interstate transmissions and sales that define the interstate wholesale market. That is a task for FERC alone.

30.     The scope of this interstate regulation grew over the years, as technological developments in the mid- to late-twentieth century made it increasingly possible to transmit energy over long distances. The primarily local delivery networks of the past gave way to the modern "grid" network in which the majority of electricity transported within the continental United States will flow across one of two grids, the Eastern and Western Interconnects, subject to FERC

jurisdiction.[3]  When electricity enters into either one, it "immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce."  *New York v. FERC*, 535 U.S. at 7.

31.     With the emergence of a robust and interconnected network for the wholesale transmission and sale of electricity, local and largely autonomous networks became a thing of the past.  Further, separation of functions became possible.  Thus, company A might own the generation plant, selling its output at wholesale over transmission lines owned by company B, for delivery to company C, with company C handling the final distribution of the power to retail customers.  In other words, it became "possible for a customer in Vermont [to] purchase electricity from an environmentally friendly power producer in California or a cogeneration facility in Oklahoma." *Id.* at 8 (internal quotation marks omitted).

32.     Although state authorities retained their traditional jurisdiction over retail sales of power to customers, the expansion of the interstate wholesale market had the effect of enlarging FERC's regulatory authority relative to that of state authorities.

## II.     FERC'S INITIATIVES TO PROMOTE BETTER MANAGEMENT OF THE ELECTRIC GRID THROUGH FORMATION OF REGIONAL TRANSMISSION ORGANIZATIONS

33.     The expansion of the interstate market for transmission and wholesale sale of electric energy also introduced new problems and complexities.  A national energy market stretched across multiple grids, numerous public utilities, and countless inputs, outputs, and junctures, is highly susceptible to coordination and management problems.  Transmission lines, for example, are often owned by individual public utilities.   FERC became concerned that utilities that own the

---

[3]   In addition to the Eastern and Western Interconnects, a third power grid, the Electric Reliability Council of Texas ("ERCOT") exists within the State of Texas.  ERCOT borders the Entergy Region immediately to the west.  However, except for a few limited ties, the ERCOT grid is electrically separate from the Eastern and Western Interconnects.

transmission lines were in a position to favor their own transmission needs over those of competitors that wish to use the lines.

34.     FERC responded to this concern in 1996 by issuing Order No. 888.  *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996).  Invoking FERC's authority under the FPA, Order No. 888 prescribed rules designed to remedy any such undue discrimination by imposing open access requirements on monopoly-owned transmission lines.  Taking such steps was "imperative," FERC concluded, to "ensure that all wholesale buyers and sellers of electric energy can obtain non-discriminatory transmission access, that the transition to competition is orderly and fair, and that the integrity and reliability of our electricity infrastructure is maintained."  *Id.* at 31,635.  Among other things, Order No. 888 required all public utilities that own, control or operate jurisdictional transmission facilities to provide wholesale transmission service pursuant to an open access transmission tariff on file with FERC, and to establish an electronic information network— referred to as an Open Access Same-Time Information System ("OASIS")—that would allow customers to reserve transmission service and to obtain access to transmission system information on a non-discriminatory basis.

35.     However, Order No. 888 did not resolve one of the more fundamental questions of regional electrical coordination and grid management:  Who among all the interested parties could best manage the larger regional electric grid such that power could be generated and delivered to the places where it was needed without overloading the transmission lines?

36.     In Order No. 2000, FERC announced that its preferred solution lies in the development of RTOs, which operate as independent entities vested with operational authority for all transmission facilities under their control.  They must carry out certain minimum functions for their

respective regions, including, but in no way limited to, tariff administration and design; congestion management; market monitoring; and interregional coordination.  An RTO is responsible, *inter alia*, for placing transmission elements into and out of operation as well as monitoring the access of new power generation sources to the network's transmission lines.  Some RTOs, including MISO, have established centralized markets in which both generators and customers determine in real time the most efficient allocation of electric energy.

37.     By placing functional control over generation and transmission assets into the hands of an RTO, enormous efficiencies can be achieved:  For example, the RTO establishes different energy prices at different locations on the electric grid that provide incentives for generators to adjust their output in such a manner that the lowest-cost dispatch for the region is achieved, taking into account operational requirements and any constraints or limitations on the transmission system. RTOs also increase efficiencies in other transmission system operations, including:  regional transmission pricing and the elimination of rate pancaking (*i.e.*, the charging of one rate over one leg of the transmission distance, and a second rate over a second leg); "one-stop shopping" for transmission service over an entire region through a single OASIS node and pursuant to the terms and conditions of a single transmission tariff; improved congestion management; more accurate estimates of transmission system capacity; more effective management of parallel path flows; and improved grid reliability.  RTOs now operate regional transmission grids that deliver approximately 60% of the nation's electrical supply.

## III.   ENTERGY ARKANSAS' AND ITS AFFILIATES' EFFORT TO INTEGRATE THEIR TRANSMISSION LINES INTO MISO

### A.     Background On The Entergy Operating Companies

38.     Entergy Corporation is a public utility holding company and corporate parent of the six Entergy Operating Companies.  The Entergy Operating Companies include Plaintiff Entergy

Arkansas; Entergy Gulf States Louisiana, L.L.C.; Entergy Louisiana, LLC.; Entergy Mississippi, Inc.; Entergy New Orleans, Inc.; and Entergy Texas, Inc.

39.     The Entergy Operating Companies own and operate generation, transmission, and distribution facilities located primarily in four states:  Arkansas, Louisiana, Mississippi, and Texas. The transmission assets include 15,400 miles of transmission lines with voltages ranging between 69 kV and 500 kV, nearly all of which is located in the four states just mentioned.  Of the 15,400 miles, a mere 87 miles, or approximately one-half of one percent, are located in a fifth state:  Missouri. The 87 miles of lines are located in Oregon and Taney Counties and the "Boot Heel" section of Missouri.  Entergy Arkansas also owns four substations in Missouri that interconnect these 87 miles of lines with other utilities in Missouri.

40.     The Entergy Operating Companies serve retail customers primarily in Arkansas (through Entergy Arkansas); Louisiana (through Entergy Gulf States Louisiana, L.L.C. and Entergy Louisiana, LLC); the City of New Orleans (through Entergy Louisiana, LLC and Entergy New Orleans, Inc.), Mississippi (through Entergy Mississippi, Inc.), and Texas (through Entergy Texas, Inc.).  Because they serve retail customers, and because retail sales remain within the jurisdiction of state or local (rather than federal) authorities, these Entergy Operating Companies are regulated by the Arkansas Public Service Commission; the Louisiana Public Service Commission, the Council of the City of New Orleans, the Mississippi Public Service Commission, and the Public Utility Commission of Texas, respectively.

41.     By contrast, the Entergy Operating Companies have no retail customers in Missouri. Instead, the service provided by the Entergy Operating Companies (specifically, by Entergy Arkansas) in Missouri is interstate *transmission* service, in which non-Entergy utilities use the transmission facilities of the Entergy Operating Companies, including the 87 miles in Missouri, to

deliver power from non-Entergy generation to their own local systems.[4]   Entergy Arkansas' wholesale transmission customers in turn sell the power to their retail customers.

42.     Lacking any retail customers in Missouri, Entergy Arkansas has not been subject to retail rate regulation in Missouri akin to the regulation to which it and its affiliates are subject in Arkansas, Louisiana, the City of New Orleans, Mississippi, and Texas.   Nor does Entergy Arkansas have a tariff on file with the MoPSC to provide retail service in that state.   The only connection that Entergy Arkansas has to the MoPSC is that it holds a certificate of convenience and necessity from the MoPSC with respect to its ownership and physical control of certain of the substations located in Missouri.

**B.     The Entergy Operating Companies' Decision To Seek Approval For Integration Of Their Transmission Assets Into MISO**

43.     After FERC issued Order No. 2000, the Entergy Operating Companies made several proposals to transfer functional control of their transmission assets to an independent entity, but none of the initial proposals succeeded in gaining sufficient support from the retail regulators in Arkansas, Louisiana, the City of New Orleans, Mississippi, and Texas, and thus none of these proposals was implemented.   Each of the retail regulators in Arkansas, Louisiana, the City of New Orleans, Mississippi and Texas participated actively in the decade-long effort to transfer functional control to an independent entity, including by intervening in the FERC dockets relevant to that effort.

44.     Because state support for RTOs had waned following the California electricity crisis of 2000-2001, in 2004 the Entergy Operating Companies instead proposed to create an Independent

---

[4]   In addition, Entergy Arkansas uses the Missouri transmission assets to serve a small number of Entergy Arkansas retail customers *in Arkansas*.   (Specifically, power from the Missouri transmission lines is taken through a Missouri substation into low-voltage distribution lines that cross into Arkansas and terminate at retail customers' homes and businesses.)   This does not change the fact that, with respect to Missouri, the Missouri transmission assets are used exclusively for interstate wholesale transmission.

Coordinator of Transmission that would have broad authority to oversee the combined network of the Entergy Operating Companies, but would not create formal electricity markets of the kind that had caused concern following the California crisis.   FERC approved this proposal for an experimental four-year term.   *See Entergy Servs., Inc.*, 115 FERC ¶ 61,095, at PP 32-40 (2006), *reh'g denied*, 116 FERC ¶ 61,275 (2006).  SPP was selected to serve as the Independent Coordinator of Transmission.  This did not mean that Entergy joined the SPP RTO, or that Entergy's system was integrated into SPP such that Entergy would transfer functional control of its assets to SPP or use the SPP tariff, but rather only that SPP would oversee certain transmission-related functions of Entergy's system under Entergy's own separate transmission tariff.

45.     In 2009, FERC reviewed the initial performance of this arrangement and found that it had provided some benefit in preserving open access to the Entergy system, but that not all of the projected benefits had been realized.  *See Entergy Servs., Inc.*, 126 FERC ¶ 61,227, at PP 79, 87 (2009).  Accordingly, FERC convened a public conference with all of the Entergy Operating Companies' retail regulators to assess alternatives, including RTO participation, to achieve the benefits for the RTO for the Entergy system as a whole.

46.     FERC also offered to fund a cost-benefit study to evaluate whether the Entergy Operating Companies should join SPP as an alternative to extending the Independent Coordinator of Transmission arrangement.  The Entergy Operating Companies later agreed to fund an "addendum" study of whether they should instead join MISO.  *See Midwest Independent Transmission System Operator, Inc.*, 136 FERC ¶ 61,010, at P 6 (2011).

47.     After detailed study and analysis (supported by the above-mentioned cost-benefit studies), the Entergy Operating Companies announced in April 2011 that joining an RTO was a better option than extending the Independent Coordinator of Transmission arrangement and that

MISO was the best of the two RTO options for the Entergy Operating Companies' retail customers. They prepared a report that estimated that joining MISO would produce a projected $1.4 billion in benefits over a ten-year period to those retail customers.

48.     An additional benefit of MISO integration for Entergy Arkansas is that it provides a new form of regional coordination to support the economic dispatch of its generation assets, which was particularly important because Entergy Arkansas had decided to terminate its participation in a coordination arrangement with the other Entergy Operating Companies, known as the Entergy System Agreement.  The Entergy System Agreement is a FERC-approved tariff that provides for the joint planning, construction, and operation of the participating Operating Companies' generation and transmission facilities as a single, integrated system.  On December 19, 2005, Entergy Arkansas notified the other Operating Companies of its intent to withdraw from the System Agreement effective December 18, 2013, which triggered Entergy Arkansas' desire to find a new form of regional coordination as of December 19, 2013 and, in turn, for all the Entergy Operating Companies to consider again whether RTO participation was appropriate.

49.     Transfer of functional control over a large network of transmission assets to an RTO like MISO is a complicated endeavor that requires months (and, with respect to certain issues, years) of preparation and planning so that the RTO and joining utility can accomplish a smooth transition to the new, broader network and transfer the existing transmission service to the RTO transmission tariff.  That planning and preparation has been underway between the Entergy Operating Companies and MISO since 2011 and is nearing completion.  Entergy-affiliated entities have spent $107 million through September 2013 to implement MISO integration, and such costs are ultimately projected to reach $122 million.  Moreover, because of the complexity of integrating operations of two different bulk power systems, the process requires certainty regarding the date on which the transfer of

functional control will occur.  Here, the planned transfer of functional control is set to occur on December 19, 2013.  This date was selected to coincide with the date of Entergy Arkansas' planned departure from the Entergy System Agreement.  In recent weeks, Entergy has worked extensively with MISO to plan and prepare for the cutover process that will occur on December 19, 2013, and table-top drills and related activities along these lines are planned later this month, to ensure a successful cutover to MISO on December 19, 2013.

50.     If integration has not occurred by the end of 2013, the approvals of certain of Entergy's retail regulators will expire, introducing additional uncertainty concerning when all of the Entergy Operating Companies could together integrate all of their transmission and generation assets into MISO.

## C.     Proceedings Before FERC

51.     Pursuant to Section 205 of the Federal Power Act and 18 C.F.R. Part 35, MISO and Entergy Services, Inc. (on behalf of the Entergy Operating Companies) submitted transmission rates (including formula rate templates) for FERC approval.  *See* Entergy Services Submission, Docket No. ER13-948-000 *et al.* (FERC Feb. 15, 2013).  FERC conditionally approved these rates (and set some disputed issues for a later hearing) in *ITC Holdings Corp.*, 143 FERC ¶ 61,257 (2013), a consolidated order addressing multiple aspects of the MISO integration.  In doing so, FERC, in the exercise of its exclusive jurisdiction, did not accept multiple objections raised by interested parties, two of which are particularly relevant here because they are similar to objections that the MoPSC later accepted and transformed into conditions to its approval of the integration of the Missouri transmission assets into MISO.

52.     *First*, certain intervenors, including GMO and Empire, argued that MISO's regional transmission rate for service under the MISO Tariff was significantly higher than the rate they

currently pay under Entergy's existing tariff (which is based only on the Entergy Operating Companies' transmission facilities).   *See, e.g.*, Protest of the SPP Transmission Owners at 32-35; Comments and Protest of Associated Electric Cooperative, Inc., Docket No. EC12-145-000 *et al.*, at 8-13 (FERC Jan. 22, 2013).  These intervenors requested various forms of relief from FERC, with GMO arguing that, "to protect wholesale transmission customers from such unjust and unreasonable increases in service resulting from Entergy exercising its voluntary choice to join MISO," FERC must "require, as part of any approval, that Entergy and MISO agree to hold GMO harmless for any increased Crossroads transmission service costs and any quantifiable transmission flow/congestion costs to be caused by such Entergy/MISO integration."  Comments of KCPL Greater Missouri Operations Company, Docket No. EC12-145-000 *et al.*, at 3 (FERC Jan. 22, 2013).  FERC did not accept this request; it approved the rate formula without imposing the conditions that GMO had urged.

53.    *Second*, intervenors, including MISO's rival RTO (SPP), Empire, and GMO, complained of so-called "loop flows" that would allegedly occur over the new boundary between MISO and SPP.  In its comments, SPP argued that an earlier FERC order, *Commonwealth Edison Co.*, 106 FERC ¶ 61,250 (2004), required a hold harmless requirement on present facts to "protect" neighboring utilities "from the financial impacts associated with loop flows and congestion created by [Entergy's] RTO choices."  *See* Comments of Southwest Power Pool, Inc. at 8, FERC Docket No. EC12-145-000 *et al.* (January 22, 2013) (internal quotation marks omitted).  FERC dismissed the argument, noting that MISO and SPP were still renegotiating their own JOA, and directing MISO to file on or by November 1, 2013 an "informational report detailing the status of [those] negotiations regarding revisions to existing [joint operating agreements] or the development of new [joint

operating agreements] to address the loop flow concerns . . . ." *ITC Holdings Corp.*, 143 FERC ¶ 61,257, at P 152.[5]

54.     Intervenors subsequently sought rehearing of FERC's determination on both issues. *See* Request for Rehearing And Clarification Of Kansas City Power & Light Company, KCP&L Greater Missouri Operations Company, And The Empire District Electric Company, Docket No. EC12-145-000 *et al.* (FERC July 22, 2013); Request for Clarification and Motion for Settlement Judge Proceedings or, in the Alternative, Request for Rehearing of the SPP Transmission Owners, Docket No. EC12-145-000 *et al.* (FERC July 22, 2013).  Those requests for rehearing remain pending before FERC, underscoring the impropriety of the MoPSC addressing the issues they raise.

### D.     Proceedings Before Retail Rate Regulators In Arkansas, Louisiana, The City of New Orleans, Mississippi, And Texas

55.     The Entergy Operating Companies submitted formal RTO integration applications to each of the five retail regulators.[6]  No application was submitted to the MoPSC.  Given the absence of Entergy Arkansas retail customers in Missouri or retail tariffs on file with the MoPSC and the fact that the MISO integration involved only a transfer of functional control, the Entergy Operating Companies did not believe that the MoPSC had jurisdiction to approve the MISO integration.

---

[5]  *Commonwealth Edison*, FERC explained, is readily distinguished.  "[T]he hold harmless remedy for utilities in [that case] was not established to address loop or parallel flows *per se*, but rather geographic separation of certain utilities from the rest of their RTO, a situation that does not exist here."  143 FERC ¶ 61,257, at P 148.  Also, RTOs "were just forming" around the time of *Commonwealth Edison* and had not yet developed the various "joint operating agreements" now used "to address issues such as these."  *Id.* at P 149.  In any event, FERC, and not any state commission, was exercising authority over a hold harmless remedy.

[6]  The Entergy Operating Companies made these filings with their respective retail regulators because these regulators have authority over the retail rates of the Operating Companies (including the transmission component of bundled retail service), and RTO participation involves a change in functional control of transmission.  (In doing so, however, the Operating Companies did not waive any rights under federal law.)  By contrast, with respect to Missouri, Entergy Arkansas' Missouri-based transmission assets are used exclusively for wholesale interstate service, and thus FERC's authority as to those lines is clearly exclusive of any MoPSC role.

56.     Each of the other five retail regulators approved the planned integration of transmission assets into MISO.  Each regulator imposed conditions, but those conditions do not bear any similarity to the conditions that the MoPSC would later impose in its Order.[7]  The Louisiana Public Service Commission granted the application on June 28, 2012; the Public Utility Commission of Texas on October 26, 2012; the Mississippi Public Service Commission on November 15, 2012; the City of New Orleans on November 15, 2012; and the Arkansas Public Service Commission on April 8, 2013.[8]

### E.      Proceedings Before The Missouri Public Service Commission

57.     In addition to Entergy Arkansas' (and the other Entergy Operating Companies') effort to transfer *functional* control of their transmission assets to MISO, the Entergy Operating Companies are, in a separate transaction, seeking to transfer *physical and legal ownership* of those assets to ITC Holdings, Inc. ("ITC") through the "ITC Transaction."  The Entergy Operating Companies have treated the two transactions entirely separately in their applications for regulatory approval from the state authorities and FERC.  Whereas FERC and the five retail regulators have provided various approvals related to the MISO integration as described above, and FERC has approved the ITC Transaction, the applications to the retail regulators for approval of the ITC Transaction remain

---

[7]  For example, the Louisiana Public Service Commission conditioned its approval on Entergy Arkansas, and not just Entergy Gulf States Louisiana, L.L.C. and Entergy Louisiana, LLC, joining MISO.

[8]  On September 18, 2013, the Arkansas Commission issued an order directing Entergy Arkansas and MISO "to appear and show cause why the Commission should not find that [Entergy Arkansas] and MISO are in violation of Condition No. 2 of Order No. 68" in that proceeding—a condition that relates to the planning of the Entergy Arkansas transmission within MISO.  Entergy Arkansas and MISO have since submitted responsive testimony reaffirming their intent to comply with the Arkansas Commission's orders, including that condition.  In any event, the Arkansas Commission has not suggested that it seeks to impose conditions on the integration akin to those imposed by the MoPSC Order.

pending.  The Entergy Operating Companies intend to proceed with the MISO integration without regard to whether the ITC Transaction remains pending or how it has been resolved as of December 19, 2013.  In other words, whether the MISO integration proceeds is not dependent on the outcome of the ITC Transaction in any way.

58.     As noted above, given that Entergy Arkansas has no retail customers in Missouri and that its MISO integration will not result in a transfer of physical or legal ownership of the assets, Entergy Arkansas did not believe that it was required to seek the MoPSC's approval for the transfer of functional control of the Missouri transmission assets to MISO.   By contrast, as to physical ownership of the Missouri transmission assets, which would be transferred in the ITC transaction, Entergy Arkansas and ITC decided to submit an application to the MoPSC for approval of that transfer out of an abundance of caution, but nevertheless reserved its challenge that the assets were FERC jurisdictional.  Accordingly, on February 14, 2013, Entergy Arkansas and ITC applied to the MoPSC for approval of the transfer of ownership of the assets to ITC.   The application commenced File No. EO-2013-0396 (the "ITC Proceeding") before the MoPSC.

59.     In the ITC Proceeding, certain intervenors sought to raise issues concerning the MISO integration.  Entergy Arkansas viewed those issues as beyond the MoPSC's jurisdiction under state law and also preempted or precluded from the MoPSC's consideration by federal law.  In any event, given the distinctness of the MISO integration transaction from the ITC transaction, Entergy Arkansas viewed those issues as not properly raised in the ITC Proceeding.

60.     Accordingly, on March 21, 2013, Entergy Arkansas filed, as a separate proceeding before the MoPSC, a "Notification Of Intent To Change Functional Control Of Its Missouri Electric Transmission Facilities To The Midwest Independent Transmission System Operator, Inc. Regional Transmission Organization Or Alternative Request To Change Functional Control And Motions For

Waiver And Expedited Treatment."  That filing commenced a separate docket, File No. EO-2013-0431 (the "MISO Integration Proceeding").  It set forth Entergy Arkansas' position that the MoPSC lacks jurisdiction under state law, and in any event is preempted or precluded by federal law, from regulating the transfer of functional control of the Missouri transmission assets to MISO.  In the alternative, and without waiving those arguments, Entergy Arkansas requested the MoPSC's expedited approval of that transfer.

61.     Subsequently, the MoPSC allowed several parties—Empire, KCPL GMO, and the Missouri Joint Municipal Electric Utility Commission ("MJMEUC")—to intervene in the MISO Integration Proceeding.  GMO intervened despite the fact that its service relates to a generating facility interconnected with Entergy Mississippi, Inc.'s transmission facilities, and it does not take service at any delivery point on the Entergy Arkansas-owned Missouri facilities.  KCPL, GMO, and Empire all argued for imposition of a hold harmless requirement.  *See, e.g.*, Post-Hearing Brief of Kansas City Power & Light Company and KCP&L Greater Missouri Operations File No. EO-2013-0396 *et al.*, at 22 (Mo. Pub. Serv. Comm'n July 12, 2013) (requesting a "requirement that [Entergy] and/or ITC 'hold harmless' non-MISO Missouri retail consumers"); Reply Brief of Kansas City Power & Light Company and KCP&L of Greater Missouri Operations Company, File No. EO-2013-0396 *et al.*, at 16 (Mo. Pub. Serv. Comm'n Aug. 2, 2013) (same); *compare* ¶ 9, *supra*.

62.     After written testimony, a hearing, and briefing, the MoPSC issued an Order in the MISO Integration Proceeding on October 9, 2013.  The MoPSC Order has an effective date of November 8, 2013.  Ex. A.  Notwithstanding Entergy Arkansas' arguments, the Order asserted jurisdiction over the proposed transfer of functional control of the Missouri transmission assets to MISO.

63.     The MoPSC Order found that certain of the intervenors or their retail customers would face increased costs each year as a result of the transfer.  Specifically, the Order found that GMO would face a cost of $6,095,917 (although most of this would be borne by shareholders, not retail customers because the MoPSC previously had precluded GMO from recovering such costs from GMO's Missouri retail customers) and Empire's customers would face an increase in rates of approximately $1 million.  Ex. A at 7.  The Order also found that customers of another Missouri utility, Ameren Missouri, could face a *decrease* in rates equating to a $9 million benefit.  Ex. A at 6.  The Order further found that, as a result of the transfer, power flows could be substantially altered at the boundary between MISO and SPP.  Ex. A at 9.

64.     The MoPSC Order went on to find that "[r]ate mitigation has been proposed in the context of a similar case pending in Arkansas," Ex. A at 8, which the MoPSC apparently viewed as supporting the hold harmless condition (discussed below) imposed by the MoPSC Order.  The MoPSC Order failed to recognize that the Arkansas rate mitigation was *not* proposed in the context of the MISO integration, but rather in the context of the separate transaction in the ITC Proceeding involving transfer of physical and legal ownership of Entergy Arkansas' transmission assets to ITC.  Indeed, the Arkansas rate mitigation referenced by the MoPSC was calculated assuming that Entergy Arkansas had already integrated into MISO.

65.     The "Decision" portion of the MoPSC Order states in relevant part:

[T]he proposed migration of the functional control of [Entergy Arkansas'] transmission assets into MISO . . . is not detrimental to the public interest if the Commission imposes conditions upon it so that Missouri ratepayers are held harmless and so that safety and reliability of the transmission grid in Missouri is ensured.

Without such conditions, ratepayers of Missouri's non-MISO utilities, namely, ratepayers of Empire, GMO and KCP&L, could suffer financial harm and have their electrical service disrupted.  The lack of those conditions would be

contrary to the Commission's statutory mandate of ensuring that Missourians receive safe, adequate and reliable utility service at just and reasonable rates.

### THE COMMISSION ORDERS THAT:

1.      Entergy Arkansas, Inc.'s migration of its Missouri transmission assets into The Midcontinent Independent System Operator, Inc., is approved, conditioned upon the negotiation and approval of a revised Joint Operating Agreement between Southwest Power Pool, Inc., and the Midcontinent Independent System Operator, Inc., addressing, at a minimum, the loop flow issues and other altered flows related to the Missouri seam between Southwest Power Pool, Inc., and The Midcontinent Independent System Operator, Inc., and conditioned upon a requirement that Entergy Arkansas, Inc., and/or ITC Midsouth, LLC, hold harmless non-MISO Missouri retail customers from all increased costs due to Entergy's potential transfer of functional control of its transmission assets to The Midcontinent Independent System Operator, Inc.

2.      Beginning June 30, 2014, and every year thereafter on or about June 30 until otherwise ordered by the Commission, Entergy Arkansas, Inc., or its successors-in-interest shall file a report with the Commission concerning its participating in The Midcontinent Independent System Operator, Inc., the safety and reliability of transmission service Entergy Arkansas, Inc., or its predecessors-in-interest, have provided to its customers, and the status of the Joint Operating Agreement between Southwest Power Pool, Inc., and The Midcontinent Independent System Operator, Inc.

Ex. A at 12-13.[9]  Entergy Arkansas filed an application for rehearing on November 7, 2013, which remains pending at the MoPSC.  The MoPSC Order became effective on November 8, 2013.

### F.      Entergy Arkansas' Temporary Arrangement For The Missouri Transmission Assets

66.      The MoPSC Order imposes conditions that go into effect when Entergy Arkansas transfers functional control of its Missouri transmission assets to MISO.  *See* Ex. A at 13 ("Entergy Arkansas, Inc.'s *migration of its Missouri transmission assets into [MISO]* is approved, conditioned on . . . .") (emphasis added).  Because Entergy Arkansas and the Entergy Operating Companies find

---

[9]      The MoPSC Order also included a third condition that purports to require Entergy Arkansas to file an annual report with the MoPSC concerning its MISO participation. Ex. A at 13. To the extent the reporting requirement is designed to support the Order's unlawful conditions, it is also unlawful.

those conditions so burdensome as to be practically unworkable (as well as legally invalid), yet must proceed with the MISO integration by the December 19, 2013 deadline, Entergy Arkansas on October 15, 2013 filed with FERC a separate transmission tariff—the Missouri Open Access Transmission Tariff ("MoOATT")—that will leave the Missouri transmission assets out of the MISO integration but allow Entergy Arkansas and the other Entergy Operating Companies to proceed with integration of all of their non-Missouri assets into MISO.  Specifically, transmission service will continue to be offered over the Missouri assets under an open access transmission tariff covering only those assets, and Entergy Arkansas will *not* transfer functional control of its Missouri facilities to MISO until the impediments created by the MoPSC are removed.  FERC noticed the filing for public comment.

67.     The temporary option is not an acceptable permanent solution because it involves increased costs and inefficiencies as compared to the transfer of functional control over these assets to MISO.  For example, Entergy Arkansas will have to incur administrative costs relating to two FERC tariffs (the MoOATT for the Missouri assets and the MISO tariff with respect to the non-Missouri assets that will have been integrated into MISO) rather than one (the MISO tariff for the Missouri and non-Missouri assets).  These costs include additional compliance requirements and contractual obligations for Entergy Arkansas, as well as the need for Entergy Arkansas to pay MISO to serve as Independent Coordinator of Transmission for the Missouri assets.  Additionally, under the MoOATT, Entergy Arkansas will face potential liabilities to transmission customers, liabilities that it would not face if there were no MoOATT and the Missouri assets were instead integrated into MISO and subject to the MISO tariff.  Moreover, within several months after the MoOATT takes effect, Entergy Arkansas will be required to establish 24-hours-a-day, 7-days-a-week operational

27

desk and other support functions to comply with FERC open-access requirements, which will require additional full-time employees or equivalent contract services.

68.     On November 5, 2013, MoPSC filed a conditional protest at FERC purporting to reserve the right to object to the MoOATT depending upon how MoPSC resolves the application for rehearing filed by Entergy Arkansas.

69.     If the MoOATT cannot take effect, Entergy Arkansas and the other Entergy Operating Companies will face two equally unworkable situations.  On the one hand, if Entergy Arkansas proceeds with integration of the Missouri assets and complies with the MoPSC Order, it will begin to incur liability for the hold harmless payments, which in turn carries the possibility of triggering similar obligations to retail customers in Arkansas (and by the other Entergy Operating Companies to retail customers in their respective states).  On the other hand, if Entergy Arkansas cannot integrate any of its transmission assets into MISO (and if, as a result, the other Entergy Operating Companies cannot integrate into MISO), then numerous harms will occur, including that the Entergy Operating Companies' retail customers will miss out on the projected $1.4 billion (over a ten-year period) in savings that would follow from MISO integration.

**Claims For Relief**

**COUNT I**
**FEDERAL POWER ACT PREEMPTION**
**(Declaratory Judgment and Injunctive Relief)**

70.     Entergy Arkansas incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1-69 and below in paragraphs 83-91 as if fully set forth herein.

71.     Under the FPA, FERC has exclusive jurisdiction over the transmission of electric energy in interstate commerce.

72.    Entergy Arkansas serves no retail customers in Missouri, and, with respect to Missouri, its Missouri transmission assets are used exclusively for transmission of electric energy in interstate commerce for sale at wholesale to utilities.

73.    The MoPSC Order's conditions lie within a field of regulation over which FERC has exclusive jurisdiction under the FPA, namely the transmission of electric energy in interstate commerce for sale at wholesale.  "[U]nbundled interstate transmissions of electric energy have never been 'subject to regulation by the States.'"  *New York v. FERC*, 535 U.S. at 21 (quoting 16 U.S.C. § 824(a)).  Moreover, as it relates to RTO participation, Congress "empowered and directed" FERC "to divide the country into regional districts for the voluntary interconnection and coordination of facilities," 16 U.S.C. § 824a, as well as to study and pursue voluntary pooling agreements between electric utilities, 16 U.S.C. § 824a-1.  FERC invoked this authority in issuing Order No. 2000.  MISO constitutes such a voluntary pooling agreement, and the MoPSC is therefore preempted from regulating on these issues under the doctrine of field preemption.

74.    Specifically, the MoPSC is preempted from conditioning Entergy Arkansas' transfer of functional control of the Missouri transmission assets to MISO on (1) negotiation of a new JOA between MISO and SPP; and (2) a requirement that Entergy Arkansas and/or the potential future acquirer of its transmission assets hold harmless non-MISO Missouri retail customers against any increase in costs due to Entergy Arkansas' transfer of functional control of the Missouri transmission assets to MISO.  The JOA condition applies to a transmission agreement approved by FERC that governs electricity flows in interstate commerce over the seam between two multi-state RTOs, and thus plainly is within the field of interstate transmission of energy.  The MoPSC Order's hold harmless condition intrudes on FERC's exclusive authority over interstate transmission rates because it requires, as a condition to Entergy Arkansas integrating its Missouri transmission assets into

MISO, that the FERC-approved MISO tariff for transmission over those lines be effectively discounted for certain Missouri retail customers.

75.     Additionally, the MoPSC Order is preempted under the doctrine of conflict preemption.  FERC declined to adopt the very conditions imposed by the MoPSC that fell within FERC's exclusive jurisdiction, including (1) whether, with respect to alleged loop-flow and other issues governed by the JOA between MISO and SPP, those two RTOs must enter into a revised JOA; and (2) whether Entergy Arkansas must hold harmless entities or persons who would experience transfer and an increase in the accompanying FERC-approved rates for that transfer. *Entergy-MISO Transmission Rate Order*, 143 FERC ¶ 61,257 (2013).   Thus, the MoPSC's contrary determination in the MoPSC Order, in which similar arguments by intervenors were accepted and transformed into conditions of the MoPSC's approval of the transaction, is in conflict with FERC's determination and stands as an obstacle to FERC's determination that the integration of the Missouri transmission assets into MISO should proceed.  Accordingly, the MoPSC Order is preempted under the doctrine of conflict preemption.

76.     Further, the MoPSC Order is preempted under the filed-rate doctrine.  FERC has approved the JOA and also has considered and conditionally approved MISO's and Entergy Arkansas' (and the other Entergy Operating Companies') proposed transmission rates for the newly configured MISO RTO that would include the Entergy Operating Companies' transmission assets. *ITC Holdings, Inc.*, 143 FERC ¶ 61,257.  Under the filed-rate doctrine, "[o]nce FERC sets such a rate, . . . [a] State must . . . give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority. Moreover, the filed rate doctrine is not limited to 'rates' *per se*," but rather extends to regulatory

decisions that "directly affec[t]" rates.  *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 967-68 (1986) (internal citation omitted).

77.    Here, the conditions imposed by the MoPSC Order effectively result in a rate that departs from the transmission rate approved by FERC.  The hold harmless condition requires Entergy Arkansas to reimburse to certain customers for a portion of the FERC-approved transmission rate, something plainly prohibited under the filed-rate doctrine.  *See, e.g., Miss. Power & Light Co. v. Miss. Ex rel. Moore*, 487 U.S. 354, 375 (1988) ("The reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts. The only appropriate forum for such a challenge is before the Commission or a court reviewing the Commission's order.").  The  JOA condition alters the filed rate for the simple reason that the JOA itself is an interstate transmission rate schedule on file with FERC and is therefore *the* filed rate, addressing matters within FERC's jurisdictional mandate.   *Nantahala Power*, 476 U.S. at 966 ("[T]he filed rate doctrine is not limited to 'rates' *per se*," and extends beyond orders that deal only "in terms of prices or volumes of purchases."); *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 812 F.2d 898, 904 (4th Cir. 1987) ("[A]lthough the [agreement] does not set a rate per se, it is in essence a rate agreement in that it sets the obligations for the privilege of receiving energy over an interstate transmission network for resale to retail customers" such that it "sufficiently resembles a filed rate to come within the realm of exclusive federal jurisdiction.").  The MoPSC Order purports to require that the JOA be renegotiated to MoPSC's satisfaction, seeking to give MoPSC veto authority over the JOA and running afoul of the filed-rate doctrine.  *See Mass. Dept. of Pub. Utils. v. United States*, 729 F.2d 886 (1st Cir. 1984) (Breyer, J.).   Accordingly, the MoPSC Order is invalid and preempted under the filed-rate doctrine.

78.     The conditions imposed by the MoPSC Order will have immediate adverse consequences for Entergy Arkansas and its affiliate Entergy Operating Companies, as well as the public in the states served by MISO.  *First*, if Entergy Arkansas does not proceed with the MISO integration at all, the projected $1.4 billion (over a ten-year period) in savings to the Entergy Operating Companies' retail customers could be lost entirely or, at a minimum, placed in significant doubt.  Significantly, MISO integration for the other Operating Companies cannot occur without Entergy Arkansas, due to the terms of the various retail regulators' orders that generally require that all of the Operating Companies join MISO together.

79.     *Second*, if Entergy Arkansas proceeds with transfer to MISO of functional control of the Missouri transmission assets, Entergy Arkansas will be required to make the hold harmless payments, which would be unrecoverable due to the Missouri's sovereign immunity.  In addition, regulators or others in states outside Missouri might argue that such payments trigger the "most favored nation" provisions of the orders approving MISO integration issued by the Operating Companies' retail regulators, under which a condition ordered by one retail regulator generally must be made available to other retail jurisdictions.  While Entergy Arkansas and the other Entergy Operating Companies would likely dispute the applicability of such provisions under these circumstances, if such arguments were successful, the provisions would require that Entergy Arkansas and the other Entergy Operating Companies make similar hold harmless payments to customers in Arkansas and other states, resulting in additional, unrecoverable damages.

80.     *Third*, if Entergy Arkansas proceeds with integration of its Arkansas transmission assets into MISO and leaves the Missouri assets behind (using MoOATT to govern those assets), Entergy Arkansas will incur additional costs associated with the MoOATT and the full benefits of having a single transmission rate, a single tariff, and single OASIS under MISO's adminstration for

all the transmission facilities owned by the Entergy Operating Companies.  Having a MoOATT

(with respect to the Missouri assets) *and* a MISO tariff (with respect to the non-Missouri assets)

saddles Entergy Arkansas with additional administrative costs and liability exposure to transmission

customers—costs and exposure that Entergy Arkansas would not face if there were no MoOATT

because then all of the assets would be within the MISO tariff.  These costs will increase

dramatically in the spring of 2014, when Entergy Arkansas will be required to incur additional

annual expenses for a 24/7 operational desk and other support functions needed to comply with

FERC requirements governing the MoOATT.

81.      The increased costs to Entergy Arkansas arising from the MoPSC Order are not

recoverable as money damages from the named Defendants, the MoPSC, or the State of Missouri

due to the State's sovereign immunity, and therefore, even to the extent they are quantifiable, such

costs constitute irreparable harm.

82.      Thus, an actual controversy exists between Entergy Arkansas and Defendants

concerning whether federal law preempts Defendants from adopting or enforcing the conditions set

forth in the MoPSC Order.

### COUNT II
### UNCONSTITUTIONAL BURDEN ON INTERSTATE
### COMMERCE UNDER COMMERCE CLAUSE AND 42 U.S.C. § 1983
### (<u>Declaratory Judgment and Injunctive Relief</u>)

83.      Entergy Arkansas incorporates by reference and re-alleges each and every allegation

set forth above in paragraphs 1-82 as if fully set forth herein.

84.      In addition to being preempted by the FPA as explained above, the MoPSC's Order is

invalid under the "dormant" aspect of the Commerce Clause, U.S. CONST. art. I, § 8, which prohibits

state laws or regulations that discriminate against or unduly burden interstate commerce.  The

MoPSC Order is invalid under each of three branches of the dormant Commerce Clause doctrine.

85.    *First*, the MoPSC Order attempts to assert control over commerce outside its borders. The integration of the Missouri transmission assets into MISO is a transaction in interstate commerce, involving the operation of facilities used to distribute electricity, at wholesale, across state lines.[10] The MoPSC Order nevertheless asserts authority to dictate whether and on what terms that transaction is completed, in a manner detrimental to the flow of interstate commerce.  In particular, by conditioning approval of the transfer on Entergy Arkansas' agreement to hold non-MISO Missouri retail customers harmless for future cost increases, the Order demands that Entergy Arkansas agree to, in essence, a substantial tax payment, indeterminate in amount and apparently perpetual in duration.  Moreover, as a factual matter, given that the Missouri assets are so small relative to the non-Missouri assets, any increase in costs faced by non-MISO Missouri retail customers is purely a function of the transfer of the *non-Missouri* assets, and would occur whether or not the Missouri assets were also transferred.  Accordingly, it is clear that the MoPSC is directly regulating commerce outside Missouri, namely the integration of the non-Missouri assets into MISO.

86.    The MoPSC Order's separate condition that SPP and MISO renegotiate a new JOA for approval by MoPSC likewise constitutes an improper regulation of extraterritorial commerce. The JOA governs the relationship between two RTOs providing electricity transmission across interlocking multistate grids, and therefore simply is not subject to state-level regulation under *Attleboro*.  Allowing Missouri to dictate the JOA's terms would allow it to project its view of an acceptable inter-RTO arrangement onto the other states affected by the MISO-SPP seam.  The situation would be even worse if other states followed MoPSC's lead.  MoPSC might insist on one

---

[10]    The non-Missouri transmission assets being integrated into MISO by the Entergy Operating Companies provide transmission service across numerous additional state lines, including the lines between Louisiana and Mississippi, between Louisiana and Texas, between Arkansas and Mississippi, and between Arkansas and Louisiana.

set of conditions, while other state regulators demanded other terms with which it would be impossible for Entergy Arkansas simultaneously to comply.

87.    *Second*, the MoPSC Order is invalid under the Commerce Clause for the additional reason that it discriminates against interstate commerce.  Specifically, the MoPSC Order's purpose and effect is to burden Entergy Arkansas, a non-Missouri entity, for the exclusive benefit of in-state interests.  Although Missouri citizens, including Ameren Missouri (a utility that already is a member of MISO) and/or its retail customers, will reap substantial benefits from the integration of Entergy Arkansas' assets into MISO, the Order places all of the costs and risks of shielding non-MISO Missouri retail customers from potential adverse effects on the shoulders of a non-Missouri entity, Entergy Arkansas:  The "hold harmless" requirement effectively taxes Entergy Arkansas alone to ensure that non-MISO ratepayers' bills do not rise, and the renegotiation requirement obligates Entergy Arkansas alone to bear the risk that SPP and MISO are unable to complete a new JOA that meets the MoPSC's as-yet-unspecified criteria for approval.  By targeting only Entergy Arkansas for these costs, the MoPSC Order discriminates against a single, identified out-of-state entity for the protectionist purpose of defending some Missourians' economic interests.

88.    *Third*, even if the MoPSC Order were not invalid on account of its impermissibly extraterritorial reach and its plainly discriminatory purpose and effect, it would still violate the dormant Commerce Clause because the burdens it places on interstate commerce vastly outweigh the benefits it provides to Missourians.  Those interstate burdens, already discussed above, include imposing on Entergy Arkansas alone a new and open-ended liability to make hold harmless payments, and preventing Entergy Arkansas from completing a multi-state transaction unless and until the MoPSC approves a renegotiated JOA between MISO and SPP.  Moreover, the MoPSC's assertion of jurisdiction and its imposition of onerous regulations on interstate wholesale

transmission facilities will tend to discourage the coordination of such lines across state borders Again, if other states were to join Missouri in acting to regulate interstate transactions concerning RTO transitions, the result would be to threaten the entire nationwide project of moving the power system onto regional grids managed by RTOs, severely burdening the development of the interstate electricity market.

89.     In view of these significant burdens on interstate commerce, the MoPSC Order is invalid.  To the extent it can be ascribed a legitimate, non-discriminatory purpose, the Order's aim is to protect certain Missouri ratepayers from the possibility that the transition into an RTO-based transmission system could cause them to "suffer financial harm and [to] have their electrical service disrupted."  Ex. A at 12.  But whatever gains Missouri's non-MISO retail customers might derive from the MoPSC Order are offset by the negative impact that a delay in integration would have on the state's many ratepayers who receive their electricity by way of MISO.   The notion that service might be "disrupted" or rendered unsafe is unsupported, and is contradicted by the fact that integration into MISO will enhance reliability.  Moreover, MoPSC failed to pursue less burdensome (than the MoPSC Order's conditions) alternatives to achieve its aims.  And in any event, any supposed benefits the Order will achieve within Missouri are far outweighed by the burdens it will impose in other states.

90.     Entergy Arkansas seeks a declaration that the MoPSC Order violates the dormant Commerce Clause.

91.     Entergy Arkansas further seeks a preliminary and permanent injunction prohibiting Defendants from enforcing the MoPSC Order.

### Prayer For Relief

In light of the foregoing, Entergy Arkansas respectfully prays that this Court:

A.      Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure, that:

i.      federal law preempts the Defendants from conditioning approval of Entergy Arkansas' transfer of functional control of its Missouri transmission assets to MISO on (a) negotiation and approval of a new JOA between MISO and SPP addressing loop flow issues and other altered flows related to the Missouri seam between SPP and MISO; or (b) a requirement that Entergy Arkansas or any current or potential acquirer of its assets to hold harmless non-MISO Missouri retail customers from any increased costs due to Entergy Arkansas' transfer of functional control of its transmission assets to MISO; and

ii.     the dormant Commerce Clause prohibits Defendants from imposing the foregoing conditions on Entergy Arkansas' transfer of functional control of its Missouri transmission assets to MISO.

B.      Issue a permanent injunction, pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from enforcing the MoPSC Order against Entergy Arkansas, the other Entergy Operating Companies, and/or MISO;

C.      Award reasonable attorneys' fees and costs; and

D.      Award such other relief available under the law that may be considered appropriate under the circumstances, including other fees and cost of this action to the extent allowed by law.

Dated: November 13, 2013

Respectfully submitted,

 /s/  James F. Bennett
James F. Bennett #65673
John D. Comerford #1443742
DOWD BENNETT LLP
7733 Forsyth Boulevard, Suite 1900
St. Louis, Missouri 63105
Telephone:  (314) 889-7300
Fax:  (314) 863-2111

*Of Counsel*:

Sanford I. Weisburst
Ellyde R. Thompson
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
Telephone:  (212) 849-7000
Fax:  (212) 849-7100

Wendy Hickok Robinson
ENTERGY SERVICES, INC.
639 Loyola Avenue, Suite 2600
New Orleans, LA 70113
Telephone: (504) 576-5437
Fax: (281) 297-5351

Gregory W. Camet
ENTERGY SERVICES, INC.
101 Constitution Avenue, NW, Suite 200 East
Washington, DC 20001
Telephone: (202) 530-7322

Kimberly Bennett
ENTERGY SERVICES, INC.
425 W. Capitol
Little Rock, AR 72201
Telephone: (501) 377-5715